STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

19-870

DAVID JEANSONNE, ET AL.

VERSUS

OHIO SECURITY INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 261,688
HONORABLE MONIQUE F. RAULS, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John E. Conery, and
Van H. Kyzar, Judges.

REVERSED IN PART; AFFIRMED IN PART;
AND REMANDED.

Greg A. Rozas
Paul J. Tanner
Rozas Law Firm, LLC
9332 Bluebonnet Boulevard
Baton Rouge, LA 70810
(225) 343-0010
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    David Jeansonne individually and on behalf of Adam Jeansonne
    Jill Jeansonne individually and on behalf of Adam Jeansonne

H. Minor Pipes, III
Catherine Fornias Giarrusso
Pipes, Miles & Beckman, LLC
1100 Poydras Street, Suite 1800
New Orleans, LA 70163
(504) 322-7070
COUNSEL FOR DEFENDANT/APPELLEE:
    Ohio Security Insurance Company

Bonita Preuett-Armour
Armour Law Firm
P. O. Box 8386
Alexandria, LA 71306
(318) 442-6611
COUNSEL FOR DEFENDANTS/APPELLEES:
    David Miller
    Steven Miller

Ryan M. Malone
Duplass, Zwain, Bourgeois, Pfister, Weinstock & Bogart, APLC
3838 North Causeway Boulavard, Suite 2900
Metairie, LA 70002
(504) 832-3700
COUNSEL FOR DEFENDANT/APPELLEE:
    Technology Insurance Company

**KYZAR, Judge.**

In this wrongful death and survival action, the plaintiffs, David and Jill Jeansonne, appeal the grant of summary judgment in favor of Ohio Security Insurance Company, dismissing it as a party defendant to the suit, finding that it did not provide insurance coverage for the vehicle involved in this dispute. For the reasons assigned, we reverse in part, affirm in part, and remand.

## FACTS AND PROCEDURAL HISTORY

David and Jill Jeansonne, individually and on behalf of their deceased child, Adam Jeansonne, filed suit, seeking wrongful death and survival damages for the death of their son, naming several parties as defendants, including Ohio Security Insurance Company (Ohio Security), the business auto insurer of A&E Enterprises of Louisiana, LLC d/b/a Alexandria Business Machines (A&E). The facts leading up to this suit, for the most part, are undisputed.

On the afternoon of Friday, April 21, 2017, Steven Miller, a managing partner of A&E, and his son, David Miller, went to Walker Automotive (Walker Automotive), a dealership in Alexandria, Louisiana, to take delivery of a 2012 Ford F-150 truck, that Mr. Miller was considering purchasing for his son. Mr. Miller signed a Loaner/Rental Agreement with Walker Automotive so that his son could test drive the truck over the weekend, after which they would return the truck on Monday. The Loaner/Rental Agreement contained Mr. Miller's home address, telephone number, and signature. After completing the agreement and providing Walker Automotive with proof of insurance and a copy of his driver's license, Mr. Miller drove the truck to his ex-wife's home, where David, who was seventeen years old at the time, lived. Mr. Miller admitted that he placed no restrictions on David's use of the vehicle.

Later that night, David and his two friends, Adam Jeansonne and Richard O'Neal, attended a party near Woodworth. Although they drove the truck to the party, David allowed Richard to drive the truck as the designated driver. When they left the party at approximately 1:00 a.m., the three friends, with Richard still driving, drove back to Alexandria and picked up two female friends, after which they rode around town for a time.

David testified that they eventually decided to take Adam home because he was inebriated and becoming sick. He claimed that once they arrived at his home, Adam refused to exit the truck, so everyone got out of the truck in order to make him get out. He stated that after Adam exited the truck and everyone else reentered the truck, Adam's father came out of the house, whereupon he locked the doors so Adam could not reenter the truck. David testified that Adam jumped into the bed of the truck and told them to leave. Shortly thereafter, Adam, who had climbed down to the passenger-side running board, was run over by the truck and killed after he fell from the running board onto the street.

The Jeansonnes filed a survival action and wrongful death suit, naming as defendants: Richard, his grandfather/guardian Russell Wilson, Richard's insurer (ABC Insurance Company), David and Steven Miller, and Ohio Security, as Mr. Miller's insurer. The Jeansonnes settled their claims against Richard, Mr. Wilson, and his insurer, and a partial judgment of dismissal was rendered on December 4, 2018, dismissing the Jeansonnes' claims against these defendants with prejudice. However, the Jeansonnes reserved their rights against Mr. Miller, David, State Farm Mutual Automobile Insurance Company (State Farm) (Mr. Miller's personal insurer), and Ohio Security.

In answering the Jeansonnes' petition, Ohio Security raised affirmative defenses alleging that the truck involved in the accident was not covered under

2

A&E's policy. It then moved for summary judgment on the issue of insurance coverage, arguing that Mr. Miller's act of borrowing the truck from Walker Automotive was personal rather than business related and that David's and Richard's actions in regards to the truck at the time of the accident were unrelated to A&E's business. In support of its motion, Ohio Security introduced excerpts from Mr. Miller's and David's depositions; a certified copy of A&E's business auto policy; the Millers' responses to the Jeansonnes' second requests for admissions; and a copy of the Walker Automotive Loaner/Rental Agreement executed by Mr. Miller.

The Jeansonnes responded by filing a cross motion for partial summary judgment on the coverage issue. They argued that the Ohio Security policy provided coverage for the truck because Mr. Miller, as a fifty-percent owner of A&E, was an insured under the policy and because he was authorized to execute the Loaner/Rental Agreement on A&E's behalf, the truck was insured under the policy's rental endorsement. They further argued that David was a permissive driver under the policy because Mr. Miller had given him permission to drive the truck; thus, Richard was also a permissive driver because he was given permission to drive the truck by David. In support of their motion, the Jeansonnes introduced Mr. Miller's and David's depositions and Walker Automotive's February 15, 2019 response to the Jeansonnes' subpoena duces tecum.

Following a June 17, 2019 hearing, the trial court granted summary judgment in favor of Ohio Security and rendered the following oral ruling:

> [W]ith regard to the [sic] both Motions for Summary Judgment, the Motion for Summary Judgment filed by the defendant, Ohio Insurance [sic] Company, the language is clear, and we must look at the policy language. And, of course, it clearly states that you are the insured, and 'you' would be A&E. And I don't think no one has disputed that, because, today the plaintiffs state that they are alleging the coverage comes under the vehicle, I mean excuse me, Rental Vehicle Endorsement. But the Court is of the opinion that this vehicle was not rented. This vehicle was borrowed.

3

It's unfortunate that kids do what happened here, they party, have a little alcohol, and accident [sic] happened. And, unfortunately, the money lies in this policy. And there's – his life is gone, and the money would never replace him, and that's not what his parents are trying to do. But they're trying to get some type of compensation, and this is just the larger policy. But there has to be coverage.

And this Court is of the opinion that the Rental Vehicle Endorsement was not triggered. Mr. Miller's testimony was he was borrowing the vehicle for his son to drive. They were going to test drive it, to see if he wanted to purchase it in the future for his son. He son already had a F-150. It was an older model. He's interested in get [sic] him, getting him another vehicle, and they went there and got this vehicle. They borrowed it. They didn't rent it. It was a borrowed vehicle, a courtesy. Just like we all can go and say we're interested in buying a vehicle, and you – they let you borrow them. You ride right off the lot, as long as you leave your insurance information and your ID.

I – the Court is just – doesn't see where the Rental Vehicle Endorsement is appliable, and where anything triggered that Endorsement to provide coverage.

So, therefore, Ohio's Motion for Summary Judgment is granted, and the plaintiff's Motion for Summary Judgment is denied.

Judgment was rendered on July 3, 2014, in favor of Ohio Security, finding no insurance coverage under its policy; denying the Jeansonnes' motion; and dismissing the Jeansonnes' claims against Ohio Security with prejudice. The Jeansonnes then moved for a new trial, which the trial court denied on September 24, 2019. Thereafter, the Jeansonnes' perfected this appeal.

On appeal, the Jeansonnes raise one assignment of error. They argue that "[t]he trial court erred by granting Defendants' [sic] Motion for Summary [Judgment] when [it] found the Ohio Security Insurance Company policy did not provide coverage for the subject accident."

## OPINION

A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact, and the mover is

4

entitled to judgment as a matter of law as to all or part of the relief prayed for. La.Code Civ.P. art. 966. A material fact is one that "potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute." *Hines v. Garrett*, 04-806, p. 1 (La. 6/25/04), 876 So.2d 764, 765 (per curiam). "A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate." *Smitko v. Gulf S. Shrimp, Inc.*, 11-2566, p. 8 (La. 7/2/12), 94 So.3d 750, 755.

Appellate courts review summary judgments *de novo* using the same criteria that governs the trial court's determination of whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Wright v. La. Power & Light*, 06-1181 (La. 3/9/07), 951 So.2d 1058; La.Code Civ.P. art. 966(A)(3). The interpretation of an insurance contract presents a question of law and is an issue well suited for resolution through a motion for summary judgment. *Cutsinger v. Redfern*, 08-2607 (La. 5/22/09), 12 So.3d 945. "An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Civil Code." *Bernard v. Ellis*, 11-2377, p. 9 (La. 7/2/12), 111 So.3d 995, 1002.

The policy issued to A&E by Ohio Security consists of several sections, including the common policy declarations, the business automobile policy declarations, the business auto coverage form, and various endorsements. The endorsements pertinent to this matter are entitled Louisiana Changes, Louisiana Changes – Coverage Extension for Rental Vehicles, and Business Auto Coverage Enhancement Endorsement Louisiana.

5

The Ohio Security policy is based on a standardized Business Auto Policy or BAP, which breaks down the autos covered by the policy into various categories, with each designated by a numerical symbol.[1] Pursuant to the declarations page, the policy provides liability coverage for "Any autos"; medical payments and uninsured motorists coverage for "Owned Private Passenger Autos"; and physical damage and towing and labor coverage for "Specifically Described Autos." "Any auto" is defined as "one that is owned, hired, nonowned, leased, or borrowed, regardless of type." PAT MAGARICK & KEN BOWNLEE, 2 CASUALTY INSURANCE CLAIMS § 22:86 (4th ed. 2008 & Supp. 2020). The policy defines "an owned private passenger auto" as an auto owned by the insured, and "specifically described autos" as those listed on the policy declaration page.

The rental-vehicle endorsement provides coverage for rental vehicles rented by the insured pursuant to a written rental agreement. A rental vehicle is defined as a vehicle "of the private passenger, pick-up or van type, not used for business purposes other than farming or ranching," if:

    a.    Not used for transporting persons for hire; and

    b.    Owned by a person engaged in the business of renting or leasing vehicle that are rented or leased without a driver, to persons other than the owner, and is registered in the name of such owner.

A "rental agreement" is defined as "any written agreement setting forth the terms and conditions governing the use of a vehicle provided by the rental company for rental or lease." La.R.S. 22:1762(F); *see also* La.R.S. 22:1523(D).

---

[1] The ten categories and their numerical designations are as follows: (1) Any autos, (2) Owned autos only; (3) Owned private passenger autos only; (4) Owned autos other than private passenger autos only; (5) Owned autos subject to No-Fault; (6) Owned autos subject to a compulsory uninsured motorist law; (7) Specifically described autos; (8) Hired autos only; (9) Non-owned autos only; and (19) Mobile equipment subject to compulsory or financial responsibility or other motor vehicle insurance law only.

At the outset, we note that La.R.S. 22:1291(B)(1) defines a loaner vehicle as "any vehicle which is provided to an insured driver by a vehicle service or sales dealer for the purpose of allowing the driver to demonstrate or test drive the vehicle." Thus, we find that the 2012 Ford F150 truck Walker Automotive provided Mr. Miller to test drive was a loaner vehicle rather than a rental vehicle. Accordingly, we find that Ohio Security's policy does not provide coverage to the Jeansonnes under the rental endorsement. If coverage is available to the Jeansonnes it must be found under the policy's primary coverage provisions.

The Ohio Security policy, under its liability coverage section, provides that it "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." The policy delineates who is an insured as follows:

The following are "insureds".

a.      You for any covered "auto."

b.      Anyone else using with your express or implied permission a covered "auto" you own, hire or borrow except:

   (1)      The owner or anyone else from whom you hire or borrow a covered "auto". This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

   (2)      Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

   (3)      Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours. However, such persons are "insureds" up to the financial responsibility limits required by Louisiana Motor Vehicle Safety Responsibility law.

   (4)      Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited

7

liability company), or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

    (5)    A partner (if you are a partnership), or a member (if you are a limited liability company), for a covered "auto" owned by him or her or a member of his or her household.

c.    Anyone liable for the conduct of the "insured" described above but only to the extent of that liability.

    . . . .

f.    Any "employee" of yours while using a covered a "auto" you do not own, hire or borrow but only for actions within the scope of their employment by you. Insurance provided by this endorsement is excess over any other insurance available to any "employee".

g.    Any "employee" of yours while operating an "auto" hired or borrowed under a written contract or agreement in that "employee's" name, with your permission, while performing duties related to the conduct of your business and within the scope of their employment. Insurance provided by this endorsement is excess over any other insurance available to the "employee."

The policy states that "you" and "your" refers to the "Named Insured," which is listed on the declarations page as A&E Enterprises of Louisiana, LLC dba Alexandria Business Machines. An "insured" is defined as "any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage."

It is undisputed that A&E is the named insured under the policy and that as a juridical person, its personality is separate and distinct from those of its members. Thus, under the plain language of the policy, A&E is the only insured under Subsection "a." However, there is no doubt that Mr. Miller was an insured under Subsection "b." while using the BMW auto owned by A&E. He would also be an insured when using, with A&E's express or implied permission, a covered auto that A&E owned, hired, or borrowed. We further find that Mr. Miller, as a member of

8

A&E, does not qualify as an "employee" under the terms of the policy as it makes a distinction between the employees, partners, or members of the insured.

In *Schroeder v. Board of Supervisors of Louisiana State University*, 591 So.2d 342, 346 (La.1991), the supreme court considered a similar commercial auto policy, which provided that an "insured" is "[a]nyone else . . . while using with your permission a covered auto you own, hire or borrow[.]" The issue was whether a vehicle driven by a student of LSU's University Laboratory School, who caused an accident while driving another student on an errand for one of the school's teachers, was a borrowed auto under LSU's auto policy. The supreme court, while noting that "borrow" was not defined under the policy at issue, stated, "[i]n common parlance, *to borrow* means not only that one receives the benefit of the borrowed object's use but also that the borrower receives temporary possession, dominion, or control of the use of the thing." *Id.* It further stated:

> Additionally, the prevailing meaning of *borrowing* is essentially the same as that conceived of by the drafters of the Civil Code. The loan for use, or *commodatum*, is a gratuitous contract by which one person delivers a thing for anothers [sic] temporary use. La.C.C. arts. 2891-2909; A. Ezkovich, *Beware! The Commodatum Lurks*, 58 Tul.L.Rev. 342 (1983). The parties to a loan for use, or *commodatum*, are referred to as the "borrower" and the "lender." La.C.C. arts. 2898, 2906. The lender retains the ownership of the object, La.C.C. art. 2895, but gratuitously delivers to the borrower the possession and use of the object, subject to the borrower returning the property after he is finished with it. By definition, the *commodatum* involves the use of nonconsumable things, and historically contemplated the use of instruments of transportation borrowed by others. In the early years of the Civil Code, horses, oxen and donkeys were the most common means of land transportation, and often the subjects of the *commodatum*, i.e., "borrowing" and "lending." *See* Lislet and Carleton, *The Laws of Las Siete Partidas which Are Still in Force in the State of Louisiana*, 623 (1820). The gratuitous loan principles of the Civil Code conform with the prevailing meaning of "borrowing" today, and have equal application to loans for use of our modern vehicles of transportation. *See, e.g., Lyle v. Guillot*, 143 So. 511, 513 (La.App. 1st Cir.1932) ("A gratuitous loan for use [of an automobile] makes the borrower, after delivery, the master of the thing borrowed, for the purpose of its use and while using it under the loan").

9

*Id.* at 346-47 (second alteration in original).

In reversing the trial court's grant of summary judgment in favor of the vehicle owner, the supreme court held that because "LSU never had any control over the automobile, even though it may have benefitted from its use by the students[,]" the vehicle at issue was not a borrowed vehicle under its policy. *Id.* at 347. Thus, in order for a vehicle to qualify as a "borrowed" vehicle, the insured or borrower must "acquire substantial possession, dominion, control, or the right to direct the use of the vehicle." *Id.* Thus, even though the truck is statutorily defined as a loaner, we find that it qualifies as a borrowed vehicle under Ohio Security's policy if it is determined that A&E, as the borrower, acquired substantial possession, dominion, or control over the truck or the right to direct its use. There is no doubt that once Mr. Miller drove the truck off Walker Automotive's lot, he acquired substantial possession, dominion, and control, and the right to direct the truck's use. The question remains whether Mr. Miller borrowed the truck for himself, personally, for A&E, or both.

Under the policy at issue, liability coverage will be found if it is determined that Mr. Miller was using with A&E's express or implied permission a vehicle that A&E owned, hired, or borrowed. After reviewing the evidence presented in support of the motions for summary judgment, we find that a genuine issue of material fact exists on the coverage issue, and that the trial court erred in granting summary judgment in favor of Ohio Security.

The Jeansonnes argue that based on his testimony, Mr. Miller, as a member with a fifty-percent ownership interest in A&E, "has the authority to act for A&E in all matters, including renting a vehicle, that do not require unanimous membership consent as stated in A&E's operating agreement." Thus, they argue that his act of borrowing or renting the truck from Walker Automotive was necessarily A&E's act

10

as well. Conversely, Ohio Security asserts that Sub-section "b." does not apply to this accident unless A&E, as the named insured, actually borrowed the 2012 Ford F-150 pick-up truck from Walker Automotive on April 21, 2017.

We note here that prior to the hearing on the cross-motions for summary judgment, Ohio Security objected to the Jeansonnes' submission of A&E's operating agreement, which purported to grant authority to Mr. Miller for certain actions on behalf of A&E without the express consent of his co-member, including hiring or renting a vehicle on behalf of A&E. The trial court sustained the objection, finding the document inadmissible for consideration of the motions. The Jeansonnes did not appeal this ruling; thus, we do not consider the operating agreement herein. However, we find from the properly submitted evidence, specifically Mr. Miller's testimony, that there is no issue of material fact that he had such authority to act on behalf of A&E.

Even though Mr. Miller was authorized to borrow a vehicle for or on behalf of A&E, this does not necessarily mean that he did so on April 21, 2017. Mr. Miller's testimony reflects that he was acting in his personal capacity as a father when he borrowed the truck. He intended to test drive the vehicle over the weekend to determine if it was suitable for his son David. David's testimony states that the vehicle, if purchased, was to replace the truck he was presently driving, which Mr. Miller owned in his personal capacity.

In addition, Mr. Miller signed the Loaner/Rental Agreement with Walker Automotive in his individual capacity and not in his capacity as an A&E representative. A&E is not listed on the agreement at all. Furthermore, while Mr. Miller gave Walker Automotive his business insurance card for the A&E-owned BMW, he stated that he also gave Walker Automotive his State Farm vehicle

11

insurance card, though he had no explanation for why Walker Automotive did not have a copy of that card on file.

Mr. Miller testified that A&E owns a number of vehicles, which are used as delivery and service technician vehicles. He stated that it also owns several vehicles that are driven exclusively by him, his business partner, Dale Rachel, and Mr. Rachel's wife. He stated that Mr. Rachel drives a 2017 GMC Sierra 1500 truck; Mrs. Rachel, who works for A&E, drives a 2012 Ford Expedition; and he drives a 2011 BMW 3-Series, which they drive to and from work. He stated that he and the Rachels use these vehicles for personal as well as business purposes. Mr. Miller admitted that Mr. Rachel was aware that he was test driving this truck because he intended to purchase it for David. He stated, "He – he would have a meeting with me, David, and he all – several times."

In the Millers' responses to the Jeansonnes' second request for admissions, they admitted that Mr. Miller rented the 2012 Ford F-150 from Walker Automotive prior to the accident and that he executed the Loaner/Rental Agreement and presented Walker Automotive with the Ohio Security insurance card as proof of insurance. They further admitted that David had permission to drive the truck from Mr. Miller's apartment back to his home and that David was in possession of the truck. They also admitted that Richard had David's permission to drive the truck on the night/early morning of the accident and that Mr. Miller was a member-manager of A&E.

Walker Automotive's file consists of copies of the Loaner/Rental Agreement, Mr. Miller's driver's license, and the Ohio Security insurance card covering the 2011 BMW 3-Series vehicle. The Loaner/Rental Agreement includes Mr. Miller's name, address, driver's license number, birthday, phone number, and two signatures. The agreement also contained the following notice:

12

You must have collision coverage under your own automobile insurance policy written in Louisiana and your collision coverage must extend to rental motor vehicles pursuant to R.S. 22:1406(f). You are responsible for any damage to or loss of the vehicle, including any consequential damages. There is no Physical Damage Waiver offered for this vehicle and your insurance is primary. You are responsible for all traffic, parking, and / or toll violations incurred during the rental or loan of this vehicle.

This is a non-smoking vehicle. Additionally, you acknowledge that the vehicle has 1/4 tank of gas and you are required to return it with the same amount. In the event the vehicle is returned with less than 1/4 tank of gas a $20.00 surcharge will be applied to your credit card.

By signing below, You acknowledge that You received and read both sides of this notice before You signed the rental Agreement.

The question to be answered is whether Mr. Miller obtained the truck as an authorized representative of A&E, in his personal capacity, or both. Surely, if he had signed the Loaner/Rental Agreement with Walker Automotive in his representative capacity for the company, we would have no difficulty in finding that there was, in fact, coverage under the express provisions of the Ohio Policy. In this case, however, Mr. Miller did not sign the agreement in the name of A&E as its authorized representative but did so in his own name. However, he provided the Ohio Security insurance card to Walker Automotive, reflecting that he was an "insured" under that policy. Louisiana Revised Statutes 22:1291(A) provides that "the primary liability, physical damage, or collision coverage for a loaner vehicle shall be the policy of the driver, not the policy of the vehicle sales or service dealer who provided the loaner vehicle." The Ohio Security policy is Mr. Miller's policy, as is the State Farm policy.

Although Mr. Miller testified that he also gave the Walker Automotive representative his State Farm insurance card, this was contradicted by Walker Automotive's records, which only contained the Ohio Security insurance card. Clearly, Walker Automotive relied on the A&E insurance policy through Ohio

13

Security when loaning the truck to Mr. Miller. Whether he also presented his State Farm insurance card is a genuine issue of material fact.

Furthermore, as a member with a fifty-percent membership interest in A&E, Mr. Miller enjoys a fifty percent share in A&E's profits and loses, the right to receive distributions of A&E's assets, and the right to vote or participate in A&E's management. La.R.S. 12:1301(14). He further admitted that he is a managing member of A&E and that the company operates pursuant to an operating agreement, which allows him to act on behalf of A&E without first obtaining permission from his co-managing member. La.R.S. 12:1311; La.R.S. 12:1301(16). Moreover, as a managing member, Mr. Miller is a mandatary of A&E "for all matters in the ordinary course of its business[.]" La.R.S. 12:1317(A).

As a managing member, Mr. Miller had the right to make business decisions on behalf of A&E. Based on the record, Mr. Miller and Mr. and Mrs. Rachel all drove vehicles that were owned by A&E, were provided for their business and personal use, and were insured under the Ohio Security policy. Mr. Miller further admitted that Mr. Rachel met with him and David several times for discussions concerning the purchase of a truck for David. Furthermore, the Ohio Security policy contained an endorsement, which amended Section "C." to include "[r]ecreational trailers and boat trailers designed for use with an auto of the private passenger type provided the trailers are not used for business purposes[]" as a covered auto under the liability coverage section of the policy. This endorsement is obviously not intended to further the business interests of A&E. Thus, we find that by providing Walker Automotive with the Ohio Security insurance card, a material issue of fact exists as to whether Mr. Miller intended to obligate A&E as the borrower or co-borrower of the truck.

14

Accordingly, we find that a genuine issue of material fact exists as to whether Mr. Miller, as a member-manager, had A&E's express or implied permission to borrow the truck on its behalf from Walker Automotive. For these reasons, the trial court judgment granting summary judgment in favor of Ohio Security is reversed and the judgment denying summary judgment in favor of the Jeansonnes is affirmed.

***Permissive Use of the Vehicle***

The next question that must be addressed is whether Richard O'Neal, the driver of the Ford F150 truck rented from Walker Automotive, was a permissive user of the vehicle at the time of the incident giving rise to Adam's death. The Jeansonnes allege in their petition that "Steven Miller granted his minor son, David Miller, permission to use the subject vehicle" and that "David Miller granted Mr. O'Neal permission to operate the subject vehicle as the group's designated driver[,]" and thus, "Mr. O'Neal was a permissive driver of the subject vehicle at the time of the incident."

Once the Loaner/Rental Agreement was completed, Mr. Miller testified that the truck was parked at his ex-wife's home, where David lived. However, he admitted that he never informed David that he did not have permission to drive the truck. He stated that he "anticipated maybe [David] would not use it until we drove it the next day." However, he admitted that he never had that conversation with David. When asked if he would approve of David designating Richard as a designated driver in any vehicle David drove, he stated, "I suppose so; yes, sir."

David confirmed that his father never specifically told him whether he could or could not drive the truck after they left Walker Automotive. He admitted that he had permission to drive the truck home after he dropped his father off at his apartment. However, he stated that he never needed his parents' permission to run errands or to drive the 2006 Ford F150 prior to this incident and the same applied to

15

his use of the 2012 Ford F150. He further stated that Richard was driving the truck with his permission when this incident occurred. Furthermore, the Millers admitted that Richard had David's permission to drive the truck the night/early morning of the accident.

In *Boudreaux v. Commerce and Industry Insurance Co.*, 18-322, p. 5 (La.App. 3 Cir. 11/7/18), 258 So.3d 856, 860-61 (alteration in original), *writ denied*, 18-2005 (La. 2/11/19), 263 So.3d 897, this court stated:

> "The question of whether the vehicle's use was permitted is answered by determining whether it was reasonably foreseeable that the first permittee would allow someone else to drive the automobile." *Mahaffey v. State Farm Mut. Auto. Ins. Co.*, 95-641, p. 4 (La.App. 3 Cir. 2/28/96), 679 So.2d 129, 131, *writ denied*, 96-1689 (La. 10/11/96), 680 So.2d 650. "Where the named insured gives permission to another to use the car as his own, the possibility that the permittee might allow another to drive the automobile is clearly foreseeable." *Id.* "Even where there has been express prohibition against third drivers, it may be reasonably foreseeable that the initial permittee would allow another to use the car. The context in which the prohibition is made is a necessary ingredient in determining reasonable foreseeability." *Id.* at 132. "[T]he issue of coverage is subject to a reasonable foreseeability test. When applying such a test, we must look at all factors involved." *Id.*

> In Mahaffey, this court found implied permission when an employee allowed his girlfriend to drive the car after the employer had orally admonished him not to let anyone else drive the car.

Based on the evidence, we find that David had permission to drive the 2012 Ford F150 and that it was reasonably foreseeable that he would allow someone else to drive the truck. Accordingly, we find that Richard was a permissive driver under the Ohio Security policy should it be found to provide coverage for the Jeansonnes' claims.

## DISPOSITION

Based on the foregoing, the judgment of the trial court, granting summary judgment in favor of Ohio Security Insurance Company, is reversed; the judgment, denying summary judgment in favor of David and Jill Jeansonne, individually and

16

on behalf of their deceased child, Adam Jeansonne, is affirmed; and the matter is remanded to the trial court for further proceedings consistent herewith. The costs of this appeal are assessed equally between the parties.

**REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.**